# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 21, 2019        Decided January 10, 2020

No. 19-5015

AMERICAN ANTI-VIVISECTION SOCIETY AND AVIAN WELFARE COALITION,
APPELLANTS

v.

UNITED STATES DEPARTMENT OF AGRICULTURE AND SONNY PERDUE, IN HIS OFFICIAL CAPACITY AS UNITED STATES SECRETARY OF AGRICULTURE,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-01138)

*Lyle D. Kossis* argued the cause for appellants. With him on the briefs was *E. Rebecca Gantt*.

*John S. Koppel*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief was *Mark B. Stern*, Attorney.

Before: TATEL, PILLARD, and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

2

TATEL, *Circuit Judge*: Eighteen years ago, Congress amended the Animal Welfare Act to require the U.S. Department of Agriculture (USDA) to issue standards "govern[ing] the humane handling[] [and] care" of "birds" not "bred for use in research." 7 U.S.C. §§ 2143(a)(1), 2132(g). Because USDA has yet to do so, two animal-rights groups sued under the Administrative Procedure Act (APA), alleging that its failure to act amounts to arbitrary and capricious action in violation of 5 U.S.C. § 706(2)(A), as well as "unlawfully withheld [and] unreasonably delayed" action in violation of 5 U.S.C. § 706(1). The district court granted USDA's motion to dismiss for failure to state a claim. For the reasons set forth below, we reverse the order of the district court and remand for further proceedings consistent with this opinion.

**I.**

Congress passed the Animal Welfare Act in 1966 "to insure that animals intended for use in research facilities or for exhibition purposes or for use as pets are provided humane care and treatment." 7 U.S.C. § 2131(1). To that end, "[t]he Secretary [of Agriculture] shall promulgate standards to govern the humane handling, care, treatment, and transportation of animals," *id.* § 2143(a)(1), and "shall make such investigations or inspections as he deems necessary to" enforce the Act and its implementing regulations, *id.* § 2146(a). But not all animals are "animals" under the Act. *Id.* § 2132(g). Until the early 2000s, the statute defined the term "animal" as "any live or dead dog, cat, monkey . . . , guinea pig, hamster, rabbit, or such other warm-blooded animal . . . [that] is being used, or is intended for use, for research, testing, experimentation, or exhibition purposes, or as a pet." 7 U.S.C. § 2132(g) (2001). According to USDA, this definition "exclude[d] birds." Miscellaneous Amendments to Chapter, 36 Fed. Reg. 24,917, 24,919 (Dec. 24, 1971). For the animals that USDA believed the Act did cover, it issued a series of species-specific

standards, some of which were required by the statute, *see* 7 U.S.C. § 2143(a)(2)(B) (dogs and primates), and others that USDA thought appropriate for certain animals, *see* 9 C.F.R. pt. 3, subpts. A–E (cats, guinea pigs, hamsters, rabbits, and marine mammals). USDA also issued general welfare standards applicable to all other animals protected by the Act. *See id.* pt. 3, subpt. F.

In 2002, however, Congress amended the Animal Welfare Act to make clear that it did protect birds. Specifically, it excluded from the definition of "animal" "birds, rats . . . , and mice . . . bred for use in research." Farm Security and Rural Investment Act of 2002, Pub. L. No. 107–171, § 10301, 116 Stat. 134, 491. USDA then acknowledged the obvious: "animal" now includes all birds *not* bred for use in research. *See* Animal Welfare; Definition of Animal, 69 Fed. Reg. 31,513, 31,513 (June 4, 2004). At the same time, explaining that its general standards "would [not] be appropriate or adequate to provide for the humane handling, care, treatment, and transportation of birds," USDA published an advance notice of proposed rulemaking, "soliciting comments from the public to aid in the development of appropriate standards for birds." Animal Welfare; Regulations and Standards for Birds, Rats, and Mice, 69 Fed. Reg. 31,537, 31,539 (June 4, 2004). In that notice, USDA promised to "publish a proposed rule for public comment" once it "determine[d] how to regulate . . . birds." *Id.* And over the following years, USDA reiterated time and again its commitment to promulgate bird-appropriate standards. *See People for the Ethical Treatment of Animals, Inc. v. USDA*, 7 F. Supp. 3d 1, 14 (D.D.C. 2013) (collecting Federal Register citations where USDA announced its intention to regulate birds). But to date, eighteen years after Congress amended the Act to make clear that it protects birds, USDA has failed to issue any standards pertaining to birds.

Animal-welfare groups first challenged USDA's inaction in 2013, when People for the Ethical Treatment of Animals (PETA) sued under the APA to compel USDA to promulgate regulations specific to birds and, in the meantime, to enforce the existing general animal-welfare standards for the benefit of birds. *See People for the Ethical Treatment of Animals v. USDA* (*PETA*), 797 F.3d 1087, 1091 (D.C. Cir. 2015). After losing in the district court, PETA narrowed its claim on appeal, "abandon[ing] its effort to require the USDA to promulgate bird-specific regulations," and declining to "pursue the allegation made in its complaint that the USDA 'unreasonably delayed' enforcement." *Id.* at 1092 (quoting 5 U.S.C. § 706(1)). Our court, after rejecting USDA's argument that PETA lacked Article III standing, addressed its sole remaining claim, holding that "nothing in the [Animal Welfare Act] requires the USDA to apply the general animal welfare standards to birds," *id.* at 1098.

In this case, having taken the baton from PETA, two other animal-rights groups, the American Anti-Vivisection Society and the Avian Welfare Coalition, sued to compel USDA either to issue bird-specific standards—a claim PETA had abandoned on appeal—or to apply its general standards to birds. The groups argued that USDA's longstanding failure to promulgate bird-applicable standards amounted to arbitrary and capricious agency action in violation of 5 U.S.C. § 706(2)(A), as well as "unlawfully withheld [and] unreasonably delayed" action in violation of 5 U.S.C. § 706(1). After finding that the two groups had standing, the district court dismissed their complaint for failure to state a claim. *See American Anti-Vivisection Society v. USDA*, 351 F. Supp. 3d 16, 26 (D.D.C. 2018). The animal-rights groups appeal, arguing that the district court was wrong to dismiss their APA claims. According to the groups, USDA must fulfill its statutory obligation to protect birds either through its general animal-

welfare standards or by issuing standards specifically applicable to birds. In response, USDA insists, as it did in the district court, that the groups lack standing and, in any event, that the district court properly dismissed their claims. We begin, as we must, with standing. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94–95 (1998) (requiring jurisdictional issues to be decided first).

## II.

The Avian Welfare Coalition, one of the two organizations that brought this action, sues "in its own right to seek judicial relief from injury to itself and to vindicate [the] rights and immunities the [organization] itself may enjoy." *Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006). Organizations can establish their own standing by "mak[ing] the same showing required of individuals: an actual or threatened injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision." *American Society for Prevention of Cruelty to Animals v. Feld Entertainment, Inc.*, 659 F.3d 13, 24 (D.C. Cir. 2011). To demonstrate injury in fact, an organization must allege a "concrete and demonstrable injury to the organization's activities" that is "more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

In *PETA*, we held that "USDA's refusal to apply the [Animal Welfare Act] to birds perceptibly impaired PETA's mission" by "depriv[ing] PETA of key information that it relies on to educate the public." 797 F.3d at 1094 (internal quotation marks omitted). "One of the primary ways in which PETA accomplishe[d] its mission," we explained, was "educating the public by providing information about the conditions of animals held by particular exhibitors." *Id.* (internal quotation

marks omitted). To do so, PETA relied on the "inspection reports" that USDA routinely generates for the animals whose handling and care it regulates. *Id.* at 1096. But USDA never produced any inspection reports for birds. Because USDA's inaction "'den[ied] [PETA] access to information . . . [it] wish[ed] to use in [its] routine information-dispensing . . . activities,'" we concluded that PETA had "'alleged inhibition of [its] daily operations, an injury both concrete and specific to the work in which [it] [was] engaged.'" *Id.* at 1094 (quoting *Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d 931, 937–38 (D.C. Cir. 1986)).

Our decision in *PETA* controls here. The Coalition's "mission is to protect and raise awareness about the plight of captive birds, and to serve as an educational resource for the humane community, law-makers, and the general public." Am. Compl. ¶ 29. The Coalition also fields and "respond[s] to complaints [of] cruelty to birds." *Id.* ¶ 33. Like PETA, the Coalition would pursue its objectives by relying on USDA information—in this case the federal standards themselves. Those standards would provide the substance from which the Coalition would "educat[e]" the "public" and "promot[e] [] humane treatment of birds," and would be used to gauge "cruelty to birds." *Id.*; *see id.* ¶¶ 30–35. And according to the Coalition, many animal shelters would on their own "seek to comply with existing regulations and are more likely to treat birds humanely where applicable bird welfare . . . regulations exist." *Id.* ¶ 31. But because of "USDA's failure to enact regulations," the Coalition has been compelled to fill the void by developing the "guidance on topics like handling and restraint, feeding, housing, and stress minimization" that federal standards would otherwise provide. *Id.* ¶ 34. To this end, the Coalition has developed "How To Guides," "webinars," and "informational pamphlets that are designed to help shelters and care facilities tend to the needs of birds." *Id.*

¶ 34. These activities, which "were not part of [the Coalition's] normal annual expenditures until the efforts became necessary due to USDA's clear inaction," *id.* ¶ 39, have caused a "consequent drain on the organization's resources," *Havens Realty*, 455 U.S. at 379.

As in *PETA*, then, USDA's alleged inaction has "perceptibly impaired," *id.*, the Coalition's organizational interests by depriving it "of key information that it relies on" to fulfill its mission, *PETA*, 797 F.3d at 1094. Indeed, the Coalition's claim for standing is even stronger than was PETA's. Whereas PETA had standing even though it had no legal right to the incident reports it sought, *see id.* at 1103 (Millett, J., dubitante), the Coalition seeks standards that it alleges USDA is legally required to promulgate. What's more, the Coalition's alleged injury flows directly from USDA's failure to issue bird-appropriate standards, whereas PETA's injury depended not just on the Department's failure to issue standards, but also on its subsequent failure to generate "inspection reports." *See id.* at 1095.

Because the Coalition has alleged facts sufficient to establish Article III standing, we need not consider whether the Anti-Vivisection Society too has standing. *See Hardaway v. D.C. Housing Authority*, 843 F.3d 973, 979 (D.C. Cir. 2016) (requiring only one party to have standing where parties seek the same relief). Accordingly, we turn to the merits.

## III.

The APA authorizes courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). When review is sought "under [a] general review provision[] of the APA," like section 706(2)(A), "the 'agency action' in question must be 'final agency action.'" *Lujan v. National Wildlife*

*Federation*, 497 U.S. 871, 882 (1990) (citing 5 U.S.C. § 704). To be final, an action must (1) "mark[] the consummation of the agency's decisionmaking process" and (2) be one by which "rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks omitted). The district court found that the Coalition failed to satisfy the first of these two requirements and dismissed its section 706(2)(A) claim. We agree.

Although many years have passed since USDA sought public comment on bird-specific standards, it has repeatedly reiterated its intention to issue such standards and, as the district court emphasized, it has "neither taken any action nor issued anything suggesting that it will not . . . promulgate bird-specific regulations." *American Anti-Vivisection Society*, 351 F. Supp. 3d at 26. USDA's decisionmaking process thus remains unconsummated. To be sure, the process has been long delayed, but that is the core of the Coalition's section 706(1) "unreasonably delayed" claim—to which we now turn.

In order to bring an "unreasonably delayed" claim, the Coalition must, as the Supreme Court explained in *Norton v. Southern Utah Wilderness Alliance* (*SUWA*), 542 U.S. 55 (2004), "assert[] that [USDA] failed to take a discrete agency action that it is required to take." *Id.* at 64 (emphasis omitted). The district court dismissed the Coalition's section 706(1) claim because it had "failed to sufficiently allege a discrete agency action that the Department must take." *American Anti-Vivisection Society*, 351 F. Supp. 3d at 24. This time, we disagree.

Recall that the Animal Welfare Act, as amended eighteen years ago, requires USDA to issue standards governing the humane treatment, not of animals "generally," as the

Department argues, *see* Appellees' Br. 13–14, but of "animal[s]" as a defined category of creatures including "birds" not "bred for use in research," 7 U.S.C. § 2132(g). And recall also that USDA has conceded that its general animal-welfare standards are inadequate to ensure the humane treatment of birds. *See supra* at 3; *see also* Appellees' Br. 13 (conceding it "has not attempted to argue that these general regulations apply to birds"). Given this, USDA has yet to fulfill its statutory responsibility to issue standards regarding the humane treatment of birds: the general standards do not apply, and the Department has issued no standards specifically applicable to birds. Put in terms of *SUWA*, USDA has failed to take a "discrete action"—issuing standards to protect birds—that the Act "require[s] it to take." 542 U.S. at 64 (emphasis omitted).

Contrary to USDA's argument, nothing in *PETA* forecloses the relief the Coalition seeks. Because PETA had chosen to abandon both its pursuit of species-specific standards and its "unreasonably delayed" claim, we considered only its remaining claim—that by failing to enforce its general animal-welfare standards with respect to birds, USDA had "unlawfully withheld" agency action within the meaning of section 706(1). Highlighting the claims PETA had dropped, we held that "nothing in the [Act] requires the USDA to apply the general animal welfare standards to birds . . . before finalizing its bird-specific regulations, at least in light of PETA's abandonment of its argument that the USDA unreasonably delayed enforcement." *Id.* at 1098. By contrast, the Coalition contends that USDA has "unreasonably delayed" protecting birds in any way, whether by "formally stating that the current general regulations . . . do apply to birds, *or* [by] enact[ing] bird-specific regulations." Appellants' Br. 35 (emphasis added).

Given that the Coalition has adequately alleged that USDA has failed to take a "discrete agency action" that it is

"required to take," *SUWA*, 542 U.S. at 64 (emphasis omitted), the only remaining section 706(1) question is whether that action—the issuance of standards to protect birds—has been "unreasonably delayed," *cf. Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) (outlining six factors courts consider in determining whether agency delay was unreasonable). Because that issue is unbriefed here, we remand to the district court to consider it in the first instance.

*So ordered.*