# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

───────

Argued September 18, 2025      Decided December 30, 2025

No. 24-1164

INDEPENDENT MARKET MONITOR FOR PJM,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

DOMINION ENERGY SERVICES, INC., ET AL.,
INTERVENORS

───────

On Petition for Review of an Order of the
Federal Energy Regulatory Commission

───────

*Jeffrey W. Mayes* argued the cause and filed the briefs for petitioner.

*Jason T. Perkins*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *David L. Morenoff*, Acting General Counsel, and *Robert H. Solomon*, Solicitor.

*Steven M. Nadel* argued the cause for intervenors in support of respondent. With him on the brief were *Christopher R. Jones*, *Miles H. Kiger*, *William M. Rappolt*, *Gary E. Guy*,

*John Longstreth*, *Donald A. Kaplan*, and *Chimera N. Thompson*.

Before: HENDERSON and KATSAS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

Opinion concurring in the judgment filed by *Senior Circuit Judge* EDWARDS.

KAREN LeCRAFT HENDERSON, *Circuit Judge*: PJM Interconnection LLC (PJM), which manages an electrical grid spanning thirteen states and the District of Columbia, hired Petitioner Market Monitoring Analytics LLP as its independent market monitor (IMM) to monitor and report on market conditions in PJM's region. For a time, PJM permitted IMM to sit in on meetings held between the PJM Board of Managers (Board) and PJM's Liaison Committee, a nonvoting body that serves as a forum for open communications between PJM Members and the Board. That practice came to an end, however, when PJM decided to enforce a provision in the Liaison Committee's charter limiting attendance to end-use customers and regulated utilities serving the PJM market region. IMM complained to the Federal Energy Regulatory Commission (FERC or Commission) regarding this policy change and the Commission sided with PJM. IMM now petitions for review. Because we conclude that IMM lacks standing, we dismiss the petition for lack of jurisdiction.

## I. BACKGROUND

Since the 1990s, the Commission "has encouraged transmission providers to establish 'Regional Transmission Organizations'" (RTOs) as part of a broader effort to create a

more competitive and efficient electricity market. *Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty.*, 554 U.S. 527, 536 (2008). RTOs are Commission-regulated entities that have operational control of "all transmission services in a particular region independent of the utilities that own the transmission lines." *NRG Power Mktg., LLC v. FERC*, 718 F.3d 947, 950 (D.C. Cir. 2013). "Among other things, these organizations manage the electricity grid in their respective geographic regions, steady the supply of and demand for energy in those regions, and ensure that the grid remains reliable over the long haul." *Vistra Corp. v. FERC*, 80 F.4th 302, 307 (D.C. Cir. 2023) (citation omitted).

The Commission's rules also require each RTO to "perform a market monitoring function to ensure that markets within [its] region . . . do not result in wholesale transactions or operations that are unduly discriminatory or preferential." *Elec. Power Supply Ass'n v. FERC*, 391 F.3d 1255, 1260 (D.C. Cir. 2004) (citation modified); *accord* 18 C.F.R. § 35.34(k)(6). RTOs "can choose to perform the monitoring function themselves or use an independent contractor." *Elec. Power Supply Ass'n*, 391 F.3d at 1260.

Whether they are in-house or hired from the outside, the Market Monitors operate as auditors within their RTOs, "largely confined to observing the [RTO] market's operations and . . . offering recommendations" on how to improve market conditions. *Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1233 (D.C. Cir. 2018). They generally have no authority to implement Commission-approved tariffs and must operate independently of any regulated utilities operating within the RTO's market region. *See* 18 C.F.R. § 35.28(g)(3)(iii)(A), (vi). Under the Commission's rules, the Market Monitor performs three core functions: (1) "[e]valuate existing and proposed market rules, tariff provisions and market design elements and

recommend proposed rule and tariff changes"; (2) "[r]eview and report on the performance of the wholesale markets" to its RTO; and (3) "[i]dentify and notify the Commission" of any violations of the Commission's rules or the RTO's tariffs. 18 C.F.R. § 35.28(g)(3)(ii)(A)–(C). "[T]o enable the Market Monitoring Unit to carry out its functions," the Commission's rules require each RTO to provide its Market Monitor with unfettered "access" to the RTO's "market data" and "databases of market information." *Id.* § 35.28(g)(3)(i)(A)–(B). RTOs must also codify these disclosure policies in their tariffs. *See id.* § 35.28(g)(3)(i).

PJM is an RTO that operates transmission facilities in thirteen states and the District of Columbia. *Del. Div. of the Pub. Advoc. v. FERC*, 3 F.4th 461, 463 (D.C. Cir. 2021). As the Commission's rules require, PJM outlined the powers and responsibilities of its Market Monitoring Unit in Attachment M of its Open Access Transmission Tariff (Attachment M or PJM Tariff).

Section IV of Attachment M describes the functions and responsibilities of PJM's Market Monitor. It provides that the Market Monitor is to "objectively monitor the competitiveness of PJM Markets, investigate violations of FERC or PJM Market Rules, recommend changes to PJM Market Rules [and] prepare reports for the Authorized Government Agencies." Addendum (Add.) 14–15, § IV.A. The Market Monitor may also "initiate and propose" changes to the PJM Market Rules and the PJM Tariff. Add. 15–16, § IV.D. Subsection G of Section IV provides that the Market Monitor "may, as it deems appropriate or necessary[,] . . . participate . . . in stakeholder working groups, committees or other PJM stakeholder processes." Add. 17.

Attachment M goes on to address, in Section V, the Market Monitor's entitlement to "Information and Data." Add. 21 (emphasis omitted). Pursuant to Section V, the Monitor "shall be provided" all "information gathered or generated by PJM in connection with its scheduling and dispatch functions, its operation of the transmission grid in the PJM Region or its determination of Locational Marginal Prices." Add. 21, § V.A. Section V also empowers the Market Monitor to make reasonable requests for information in the hands of any PJM Market Participant, so long as the Monitor "determines that [this] information is required to accomplish" its objectives. Add. 21, § V.B.1. And if an entity "does not provide [the] requested information within a reasonable time, the Market Monitoring Unit may initiate . . . regulatory or judicial proceedings to compel . . . production," by, for example, "petitioning the Commission for an order." Add. 21–22, § V.B.2.

Under IMM's services agreement with PJM, the responsibility to "evaluate[] whether IMM is adequately performing its functions" falls on PJM's Board of Managers, which must meet with IMM at least once per year for a performance review. Add. 181, Market Monitoring Service Agreement (MMSA) § 27. At these performance meetings, if the PJM Board "determines that IMM has acted (or failed to act) in a manner that the . . . Board believes is not adequate," IMM has the right to written notice "specify[ing] in detail the nature of the alleged inadequate performance," as well as the opportunity to explain that "the alleged inadequate performance" was "beyond [its] control or without fault or negligence on [its] part." Add. 183, MMSA § 27.7.

IMM is a vocal "participant in a wide range of PJM committees, subcommittees, task forces, user groups, and forums" that make up PJM's organizational structure. Add. 8,

Bowring Decl. ¶ 18. Although it "does not vote in any [of these] stakeholder process[es]," Add. 5, Bowring Decl. ¶ 8, it regularly "initiates and proposes changes to the [PJM market] design" during these proceedings and "comments on changes proposed" by others, Add. 4, Bowring Decl. ¶ 6. By its own count, IMM participated in more than 100 stakeholder meetings in 2024. Add. 8, Bowring Decl. ¶ 19. And it does not take part in them just for the fun of it; IMM claims that it "must be able to participate" in PJM's stakeholder proceedings to perform its "mission" of monitoring the PJM market. Add. 4, Bowring Decl. ¶ 7.

That brings us to the facts of this case. For a time, IMM attended meetings held between the PJM Board and PJM's Liaison Committee, a nonvoting body within PJM that consists of up to three representatives from each industry sector operating within the PJM market. J.A. 127. According to its charter, the Liaison Committee's objective is "[t]o foster better communications between the PJM Board . . . and the PJM Members." J.A. 126. But the Committee has no "authority to vote on or to decide any matters." J.A. 126. In these meetings, Committee members and the Board discuss various topics, including capacity market issues, market design and IMM's services agreement with PJM. Add. 7, Bowring Decl. ¶15. The discussions also serve as an opportunity for PJM Members to understand the Board's decision-making process. J.A. 126. Individuals who sit in at these meetings are "listen-only observers." J.A. 127.

Even though the Liaison Committee's charter limits attendees at its meetings to "PJM Members"—that is, utilities or other suppliers in the PJM market and their end-use customers—the prevailing practice had been to allow non-members to attend as well. Add. 178. In September 2018, however, PJM's Members Committee rejected a proposal to

ratify this practice and announced that, moving forward, only PJM Members could attend the Liaison Committee's meetings. Add. 179. Because IMM is not a PJM Member, it could no longer attend.

IMM filed a complaint before the Commission alleging that its exclusion from the Liaison Committee meetings violated Section IV.G of the PJM Tariff. IMM claimed that the Liaison Committee is a "stakeholder working group[], committee[] or other PJM stakeholder process[]" under Section IV.G and that IMM therefore has the right under this provision to "participate" in the Committee meetings. J.A. 7. The Commission dismissed IMM's complaint. It concluded that Section IV.G's phrase "stakeholder working groups, committees or other PJM stakeholder processes" refers exclusively to the "elements of [the] decision making process" within PJM that handle "proposed revisions" to PJM's tariffs, market design or other operational duties. J.A. 105. The Liaison Committee, the Commission reasoned, is not subject to Section IV.G because it exists outside PJM's decisional process as a nonvoting body that merely serves as a conduit for PJM Members to discuss various issues with the Board.

IMM petitioned this Court for review of the Commission's decision. Several regulated utilities have intervened in support of the Commission (Intervenors).

## II. ANALYSIS

Before we can address the merits of IMM's petition, we must be certain of our jurisdiction to review it. Under the Constitution, our "judicial Power" extends only to "Cases" and "Controversies," U.S. Const. art. III, § 2, cl. 1, and there can be no case or controversy unless the petitioner has standing, *West v. Lynch*, 845 F.3d 1228, 1230 (D.C. Cir. 2017) (citation omitted). To have standing, the petitioner must suffer an injury

in fact that is fairly traceable to the respondent and redressable by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Injury in fact, "the first and foremost of standing's three elements," requires the petitioner to show "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338–39 (2016) (citation modified). In determining standing, we assume IMM is correct on the merits that its exclusion from the Liaison Committee meetings violates Section IV.G. *See Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 20 (D.C. Cir. 2011).

This is not the first time we have addressed IMM's standing to challenge a purported violation of a PJM Tariff provision. In *Old Dominion Electric Cooperative*, a utility operating in the PJM market asked the Commission for permission to change retroactively its rates to recover losses it had incurred in generating surplus power in response to a polar vortex. 892 F.3d at 1229–30. The Commission denied the request, concluding that the proposed rate change would violate a PJM Tariff provision capping the price at which utilities charged customers for generating power. *Id.* at 1230. When the utility petitioned this Court for review, IMM moved to intervene in support of the Commission's decision—a request we denied. *Id.* at 1233–34.

We held in *Old Dominion* that IMM lacked standing to intervene because it had "no legally cognizable interest" in the enforcement of PJM's price-cap provision against the utility. *Id.* at 1232. As "an outside observer hired to study and report objectively on the market's operations," we explained, IMM's interests were "limited to monitoring, advising, encouraging compliance, and informing others through regulatory filings and other informal communications, none of which [were] at stake in this case." *Id.* at 1233–34. Regardless whether the

utility followed through with its proposed rate change, IMM's "ability to observe the market's operations and to make recommendations or to inform potentially interested parties of its observations remain[ed] the same." *Id.* at 1234.

The Commission and the Intervenors suggest that *Old Dominion* categorically rules out IMM's standing to challenge *any* PJM Tariff violation. Commission Br. 18–19; Intervenors' Br. 11–12. That is incorrect. The alleged tariff violation in *Old Dominion* did not even brush shoulders with IMM's ability to carry out its monitoring functions, which was the reason IMM lacked standing to intervene in that case. *See* 892 F.3d at 1234. We had no occasion to decide whether, or under what circumstances, violations of other provisions in the PJM Tariff can injure IMM sufficiently to give it Article III standing. Fairly read, *Old Dominion* left open that question.

Establishing standing is IMM's burden to bear. *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity* (*EPIC*), 878 F.3d 371, 377 (D.C. Cir. 2017). As an organization, IMM can demonstrate standing "by making the same showing required of individuals: an actual or threatened injury in fact that is fairly traceable to the [respondent's] allegedly unlawful conduct and likely to be redressed by a favorable court decision." *Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 618 (D.C. Cir. 2020) (citation modified). But as with standing for individuals, IMM's injury "must be 'concrete,' meaning that it must be real." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). A mere "setback to the organization's abstract social interests" is insufficient. *Am. Anti-Vivisection Soc'y*, 946 F.3d at 618 (quotation omitted). "To determine whether an organization's injury is 'concrete and demonstrable' or merely a 'setback,'" our inquiry is twofold. *People for the Ethical Treatment of Animals* (*PETA*) *v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1094

(D.C. Cir. 2015) (citation omitted). First, we ask whether the petitioner has shown an injury to its organizational interests. *Id.* Second, we look to whether the petitioner has "used its resources to counteract that harm." *Id.* IMM has done neither.

## A. IMM's lack of concrete harm to its interests

IMM claims that its exclusion from the Liaison Committee meetings concretely harms its interests in two ways. First, IMM argues that it is deprived of access to "information" exchanged during the Committee's meetings. Pet'r's Opening Br. 10, 12. Second, IMM maintains that its absence from the meetings denies it "notice and [the] opportunity" to respond to "complaints" about its performance made to the PJM Board. Pet'r's Opening Br. 15. We address each theory in turn and find neither to be persuasive.

Starting with its first theory, IMM claims that its lack of access to information during the Liaison Committee meetings works a concrete injury under the Supreme Court's decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), and our decisions applying it. Pet'r's Opening Br. 10–12, 14–15, 14 n.25. *Havens Realty*, however, "found informational injury . . . under a statute that . . . explicitly created a right to information." *Animal Legal Def. Fund, Inc. v. Espy*, 23 F.3d 496, 502 (D.C. Cir. 1996). By contrast, IMM seeks to enforce a legal provision that does not obligate anyone to disclose anything. *Friends of Animals v. Jewell*, 828 F.3d 989, 994 (D.C. Cir. 2016). Section IV.G on its face does not guarantee IMM "a right to receive information in a particular form," *id.* (citing *Havens Realty Corp.*, 455 U.S. at 373–75), such as transcripts, electronic recordings, minutes or other records of PJM's stakeholder proceedings. All that provision says is that IMM may "participate" in these proceedings, Add. 17, § IV.G—*i.e.*, "initiate and propose, through the appropriate

stakeholder processes, changes to the design of [the PJM] markets, . . . the PJM Market Rules and PJM Tariff." Add. 15– 16, § IV.D.

Granted, in the past we have found organizational standing under *Havens Realty* based on informational harm "even though [the organization] had no legal right" to the information it sought. *See Am. Anti-Vivisection Soc'y*, 946 F.3d at 619 (citing *PETA*, 797 F.3d at 1103 (Millett, J., dubitante)). But the Supreme Court has since "cautioned against" extending *Havens Realty* to such cases unless the organization can demonstrate how the lack of information "directly affect[s] and interfere[s] with [its] core business activities." *See Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 144 F.4th 296, 315 (D.C. Cir. 2025) (quoting *All. for Hippocratic Med.*, 602 U.S. at 395–96). IMM cannot satisfy that burden because IMM does not dispute that it already possesses the market-related information needed to carry out its tasks of "monitoring, advising, encouraging compliance, and informing others" in the PJM market. *See Old Dominion Elec. Coop.*, 892 F.3d at 1234.

Recall that the Commission's rules require every RTO to "include in its tariff a provision to provide its Market Monitoring Unit access to . . . [the RTO's] market data" and other "market information." 18 C.F.R. § 35.28(g)(3)(i)(A)–(B). PJM has done so in Section V of its Tariff, which states that IMM will be "provide[d]" all "information gathered or generated by PJM in connection with its scheduling and dispatch functions, its operation of the transmission grid . . . or its determination of Locational Marginal Prices." Add. 21, § V.A.

Critically missing here is any allegation by IMM that PJM has violated its disclosure duty under Section V. If it were

somehow the case that IMM's absence from the Liaison Committee meetings had denied it access to the "scheduling, dispatch and other operational data" referenced in Section V, Add. 21, § V.A, IMM might have a case for organizational standing under *Havens Realty*. In that case, PJM would deprive IMM of the information that it depends on "to carry out its [monitoring] functions." 18 C.F.R. § 35.28(g)(3)(i)(A). It would not be unlike providing "false information about apartment availability" to a company whose core business model is offering counseling services to home seekers, *All. for Hippocratic Med.*, 602 U.S. at 395 (citing *Havens Realty*, 455 U.S. at 379), or failing to provide incident reports of animal cruelty that animal-rights groups use as a "primary source of information" to educate the public, *PETA*, 797 F.3d at 1096 (citation omitted). Yet IMM does not claim that the Committee exchanges any Section V information with the Board during its meetings; IMM does not even identify *what* specific information is shared during these meetings. Pet'r's Reply Br. 7–8 (stating vaguely that the information is "about market design" issues). In any event, IMM has abandoned its Section V argument by conceding that it already "has access to the . . . market-related data" required under that provision. Pet'r's Reply Br. 8.[1]

---

[1] Nor does IMM's absence from the Liaison Committee meetings meaningfully impede its ability to "make recommendations" for improving PJM market conditions. *Old Dominion Elec. Coop.*, 892 F.3d at 1234. IMM admits that it remains an "active participant in a wide range" of other stakeholder meetings, during which it routinely "initiates and proposes" improvements to the PJM market, and that it "attended more than 100" such meetings in 2024 alone. Add. 4, 8, Bowring Decl. ¶¶ 6, 18–19.

13

IMM also claims that it must attend the Liaison Committee's meetings or it will lack "notice and [the] opportunity to be heard" whenever the Committee complains about its performance to the PJM Board. Pet'r's Opening Br. 15. IMM's purported injury is speculative at best, as nothing in the record indicates the Committee has used its meetings with the Board as an opportunity to malign IMM's performance.[2] Moreover, IMM is simply incorrect that it *must* attend the meetings to "know what [is] communicated [about it] to the Board" or that, unless it attends, it will not have the chance to respond. Pet'r's Opening Br. 18. As explained, IMM's services agreement already provides IMM a direct line of communication to the Board to discuss any performance-related complaints. Under the agreement, if the Board determines that IMM's performance has fallen short in some way, IMM is entitled to written "notice" specifying "in detail" the alleged deficiencies as well as the opportunity to defend itself. Add. 183, MMSA § 27.7. It stands to reason that if the Liaison Committee brings a meritorious complaint about IMM's performance to the Board, the Board will notify IMM of it in due course and allow it the chance answer. IMM disputes none of this.[3]

---

[2] And PJM recently extended IMM's contract for another six years, which, if anything, suggests that PJM is satisfied with IMM's work. Commission Br. 25 n.7 (citing PJM Transmittal Letter, FERC Dkt. No. ER25-807-000, at 2–3, 5 (Dec. 26, 2024)).

[3] We do not address IMM's separate argument that it has established a cognizable informational injury under the line of cases starting with *FEC v. Akins*, 524 U.S. 11 (1998). We conclude IMM forfeited standing under *Akins* by waiting until its reply brief to argue it. *See Twin Rivers Paper Co. LLC v. SEC*, 934 F.3d 607, 615 (D.C. Cir. 2019).

14

## B. No use of IMM resources

The second "important limitation[] on the scope of [organizational] standing" is that the organization must show how it has "used its resources to counteract" the injury. *EPIC*, 878 F.3d at 378 (quotations omitted). IMM totally fails this requirement because it "does not identify programmatic expenditures it must make to fill the gap" caused by its absence from the Liaison Committee meetings. *Ctr. for Biological Diversity*, 144 F.4th at 315. It vaguely asserts in its brief that it must "expend resources" to discover what is said during the meetings. Pet'r's Opening Br. 15. But "we can only speculate" as what those costs might be. *EPIC*, 878 F.3d at 379. "Speculation is ordinarily fatal to standing," *id.*, and so it is here. *See Viasat, Inc. v. FCC*, 47 F.4th 769, 781 (D.C. Cir. 2022) ("These unadorned assertions do not enable us to fairly assess whether the Group has satisfied the requirements for organizational standing under *Havens Realty* and *PETA*.").

\* \* \*

For the foregoing reasons, we dismiss IMM's petition for lack of jurisdiction. As it failed to do as an intervenor in *Old Dominion*, IMM has not demonstrated any concrete injury.

*So ordered.*

EDWARDS, *Senior Circuit Judge*, concurring in the judgment: This case involves a claim by Petitioner, Independent Market Monitor ("IMM"), that it has "organizational standing" to challenge a decision issued by the Federal Energy Regulatory Commission ("FERC"). IMM contends that FERC erred in rejecting its claim that PJM Interconnection, L.L.C. ("PJM") impermissibly excluded it from attending PJM's Liaison Committee meetings. IMM argues that FERC's decision "harms [its] organizational interest and significantly hinders its ability to perform its mission" as an independent market monitor. Pet'r's Opening Br. 3; *see also id.* at 10-15 (relying primarily on *Havens Realty Corporation v. Coleman*, 455 U.S. 363 (1982), and its progeny).

This case is not about informational standing. IMM never mentions "informational standing" in its opening brief to this court. Nor does it cite the Supreme Court's principal informational standing decision in *FEC v. Akins*, 524 U.S. 11 (1998), until it responds to FERC in its reply brief. *See* Pet'r's Reply Br. 4. Organizational and informational standing are distinct concepts. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (observing, after discussing the plaintiff organizations' assertion of organizational standing, that the organizations "have not claimed an informational injury").

Given the focus on organizational standing in this case, the relevant question here is whether IMM has satisfied the requirements of *Havens*. In order to support a cause of action pursuant to organizational standing, a plaintiff organization must show a "concrete and demonstrable injury to [its] activities," "with [a] consequent drain on [its] resources," which "constitutes far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp.*, 455 U.S. at 379; *see also All. for Hippocratic Med.*, 602 U.S. at 395 (summarizing *Havens* as recognizing standing when the challenged "actions directly affect[] and interfere[] with [an

organization's] core business activities" beyond its "issue-advocacy" goals). Under *Havens*, organizational standing cannot be sustained if the only alleged injury "arises from the effect . . . on the organization['s] lobbying activities," or when the impairment is to "pure issue-advocacy." *People for the Ethical Treatment of Animals ("PETA") v. USDA*, 797 F.3d 1087, 1093-94 (D.C. Cir. 2015) (citations omitted); *see also Ctr. for Biological Diversity v. U.S. DOI*, 144 F.4th 296, 315 (D.C. Cir. 2025) (requiring "injury to . . . non-advocacy operations" or programming). However, as the Court made clear in *Havens*, a plaintiff organization may successfully establish organizational standing without prevailing on the merits. *See* 455 U.S. at 379 n.21 (noting that, while the organization had standing to sue, it "[o]f course . . . will have to demonstrate at trial" the merits of its claim "before it will be entitled to judicial relief"); *see also PETA*, 797 F.3d at 1097 (holding, after recognizing PETA's organizational standing, that PETA failed to state a claim and, thus, "[h]aving won the standing battle, . . . nonetheless loses the war"). A plaintiff organization may have standing to bring a claim even if it can show "no legal right" to the remedy it seeks. *Am. Anti-Vivisection Soc'y v. USDA*, 946 F.3d 615, 619 (D.C. Cir. 2020) (discussing *PETA*).

As the majority opinion points out, the Supreme Court's *Havens* analysis has crystallized into a two-prong test for organizational standing. First, the plaintiff organization must show that the "action or omission to act injured the organization's interest." *PETA*, 797 F.3d at 1094 (cleaned up). Second, the plaintiff organization must also show that it "used its resources to counteract that harm." *Id.* (citation omitted). Again, as the Court explained in *Havens*, there can be no question that an organization has suffered injury in fact if it alleges "concrete and demonstrable injury to the organization's

activities—with the consequent drain on the organization's resources." 455 U.S. at 379.

In my view, IMM has clearly satisfied the injury-in-fact first requirement of *Havens*. IMM challenges a FERC decision that "directly affected and interfered with [its] core business activities." *All. for Hippocratic Med.*, 602 U.S. at 395. IMM's "core business" as a market monitor organization is independent oversight over PJM. It is responsible for "objectively monitor[ing] the . . . PJM Markets," "investigat[ing] violations of FERC or PJM Market Rules," and "prepar[ing] reports for . . . Government Agencies." Joint App. ("J.A.") 75-76. As IMM explains in its briefs, it cannot perform these "core business activities" without access to stakeholder committees and the stakeholder process, of which it alleges that Liaison Committee meetings are a crucial part. *See* Pet'r's Opening Br. 14 ("[IMM] requires access to the stakeholder process, including the Liaison Committee, to understand and participate in the development of proposals and guide its independent participation in FERC proceedings."); *see also* Add. 6 ("Excluding [IMM] from the Liaison Committee meetings significantly hinders its ability to perform its mission."). The question here is whether IMM has claimed FERC's decision "perceptibly impaired [its] ability" to perform its market monitor functions. *All. for Hippocratic Med.*, 602 U.S. at 395 (citation omitted). I would find that IMM has sufficiently alleged such a harm.

Before FERC issued its disputed decision, IMM had routinely attended Liaison Committee meetings until 2018. J.A. 73. IMM explains that continued access to Liaison Committee meetings is crucial to fulfilling its oversight and reporting duties because at those meetings, PJM members "advocate proposed changes to the market design" that IMM

must "monitor and respond to." Add. 6-7. Furthermore, other topics "discussed at the Liaison Committee are significant and fundamental issues about the present and future status of PJM and PJM markets and PJM transmission planning," all of which IMM has an organizational stake in monitoring. Add. 7.

This is precisely the kind of organizational injury that *Havens* recognizes. IMM does not argue that it is injured simply by virtue of its exclusion from Liaison Committee meetings; its claimed injury is that exclusion from Liaison Committee meetings impedes its ability to carry out its organizational mission and "core business" of overseeing PJM's activities. There is no prohibited issue advocacy or lobbying here, just an organization trying to perform its day-to-day activities. IMM thus satisfies the first prong's command to show "injur[y] [to] the [organization's] interest." *PETA*, 797 F.3d at 1094 (third alteration in original) (citation omitted).

The majority says that the Court's opinion in *Alliance for Hippocratic Medicine* suggests that an organization cannot show organizational standing under *Havens* based on informational harm if it has no legal right to the information it sought. I disagree. All the Court in *Alliance for Hippocratic Medicine* said was that courts should be "careful not to extend the *Havens* holding beyond its context." 602 U.S. at 396. And what the Court saw in *Havens* was a claim in which the defendant's actions "directly affected and interfered with [the organization's] core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.* at 395. This is precisely what IMM claims in this case – that FERC's disposition "directly affected and interfered with" IMM's "core business activities" of monitoring, advising, encouraging compliance, and informing others in the PJM Market. Whether IMM has a "legal right" to

continue fulfilling its role as it has in the past is a question regarding the merits of IMM's cause of action, not its organizational standing to pursue this claim.

The majority opinion appears to conflate two independent theories of standing: *Havens* (stating the requirements for organizational standing) and *Akins* (stating the requirements for informational standing). But as explained above, *Havens* does not require a plaintiff to show a legal right to the remedy it requests in order to establish organizational standing.

However, I agree with the majority that IMM has not met its burden on the second requirement for organizational standing under *Havens*. As noted above, the Supreme Court in *Havens* found it significant that the challenged activity in that case had allegedly "frustrated [the plaintiff] organization's . . . services," which led to a "consequent drain on resources." 455 U.S. at 369; *see also id.* at 379 ("Plaintiff . . . has had to devote significant resources to identify and counteract" defendant's practices (citation omitted)). Based on the Court's concern with the "drain on resources" in *Havens*, our case law requires that a plaintiff organization show that it "used its resources to counteract th[e] harm" alleged. *PETA*, 797 F.3d at 1094 (citation omitted).

To make this showing, it is not enough for an organization to merely state that it has expended resources in response to the alleged harm. Instead, an organization must offer specific representations to show a "drain on resources." *Havens*, 455 U.S. at 369; *compare PETA*, 797 F.3d at 1096 (finding that the organization satisfied the second prong by providing a declaration that PETA was "forced to expend more than $10,000" "as a direct result of the USDA's failure" and would "continue expending more than $3,000 per year on the same"

(citation omitted)), *with Ctr. for Biological Diversity*, 144 F.4th at 315 (finding that the organization could not satisfy the second prong because it "d[id] not identify programmatic expenditures it must make to fill the gap"), *and Elec. Privacy Info. Ctr. v. FAA*, 892 F.3d 1249, 1255-56 (D.C. Cir. 2018) (similarly concluding that the organization lacked standing because it "failed to identify record evidence," including "statements concerning . . . its increased expenditures").

In this case, IMM has not provided any credible information about a "drain on resources." Instead, it vaguely claims that it "has been forced to expend resources that it should not have had to expend . . . to indirectly surmise the information and positions presented [at Liaison Committee meetings]." Pet'r's Opening Br. 14-15. The applicable case law indicates that this is insufficient. As a result, IMM has not established that it has organizational standing to sue.

For these reasons, I concur in the judgment.