**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 23-1778/23-1790/23-1808/23-1984/23-2544/
23-2559/23-2560/23-2612

PJM POWER PROVIDERS GROUP,
Petitioner in 23-1778/23-2612
v.
FEDERAL ENERGY
REGULATORY COMMISSION
_____

CONSTELLATION ENERGY GENERATION LLC,
Petitioner in 23-1790/23-2544
v.
FEDERAL ENERGY
REGULATORY COMMISSION
_____

ELECTRIC POWER SUPPLY ASSOCIATION,
Petitioner in 23-1808/23-2559
v.
FEDERAL ENERGY
REGULATORY COMMISSION
_____

NRG BUSINESS MARKETING LLC,
Petitioner in 23-1984
v.
FEDERAL ENERGY
REGULATORY COMMISSION

_____

NRG BUSINESS MARKETING LLC,
as successor to NRG Power Marketing LLC,
Petitioner in 23-2560
v.
FEDERAL ENERGY
REGULATORY COMMISSION

_____

On Petitions for Review of Orders of the Federal Energy
Regulatory Commission
(FERC Docket Nos. EL23-19, ER23-729)

_____

Argued:  January 31, 2024

_____

Before:  CHAGARES, <u>Chief</u> <u>Judge</u>, RESTREPO and
FREEMAN, <u>Circuit</u> <u>Judges</u>

(Filed: March 12, 2024)

_____

Nicholas M. Gladd
Wilson Sonsini Goodrich & Rosati
201 Washington Street

Suite 2000
Boston, MA 02108


Steffen N. Johnson
Kelsey Curtis
Wilson Sonsini Goodrich & Rosati
1700 K Street NW
5th Floor
Washington, DC 20006

   Counsel for Petitioner PJM Power Providers Group

Matthew Price [ARGUED]
Anand Viswanathan
Zachary B. Cohen
Jenner & Block
1099 New York Avenue NW
Suite 900
Washington, DC 20001

   Counsel for Petitioner Constellation Energy
   Generation LLC

Paul W. Hughes, III
David G. Tewksbury
Andrew A. Lyons-Berg
Connor J. Suozzo
McDermott Will & Emery

500 N Capitol Street NW
Washington, DC 20001

>Counsel for Petitioners Electric Power Supply
>Association and NRG Business Marketing LLC

Steven M. Richman
Clark Hill
210 Carnegie Center
Suite 102
Princeton, NJ 08540

>Counsel for Intervenor-Petitioners Advanced Energy
>United, American Clean Power Association, and Solar
>Energy Industries Association

Gabriel L. Tabak
American Clean Power Association
1501 M St NW
Washington, DC 20005

>Counsel for Intervenor-Petitioner American Clean
>Power Association

Jeremy McDiarmid
Advanced Energy United
1010 Vermont Ave. NW, Suite 1050
Washington, DC 20005

>Counsel for Advanced Energy United

Ben Norris
Melissa Alfano

Solar Energy Industries Association
1425 K St NW Ste. 1000
Washington, DC 20005

      <u>Counsel for Solar Energy Industries Association</u>

Natasha Gianvecchio
Anna R. Biegelsen
Eric Konopka
Richard H. Griffin
Latham & Watkins
555 11th Street NW
Suite 1000
Washington, DC 20004

      <u>Counsel for Intervenor-Petitioner Vistra Corp</u>

Matthew R. Christiansen
Robert H. Solomon
Federal Energy Regulatory Commission
888 1st Street NE
Washington, DC 20426

Jared B. Fish [ARGUED]
United Sates Department of Justice
Civil Division
950 Pennsylvania Avenue NW
Washington , DC 20530

      <u>Counsel for Respondent Federal Energy Regulatory Commission</u>

Regina A. Iorii
Office of Attorney General of Delaware
Delaware Department of Justice
820 N French Street
Carvel Office Building
Wilmington, DE 19801

<u>Counsel for Intervenor-Respondent Delaware Division
of the Public Advocate</u>

Robert A. Weishaar, Jr.
McNees Wallace & Nurick
1200 G Street NW
Suite 800
Washington, DC 20005

<u>Counsel for Intervenor-Respondent Delaware Public
Service Commission</u>

Scott H. Strauss
Peter Hopkins
Jeffrey A. Schwarz
Spiegel & McDiarmid
1875 Eye Street NW
Suite 700
Washington, DC 20006

<u>Counsel for Intervenor-Respondent Maryland Office
of People's Counsel</u>

Miles H. Mitchell
Ransom E. Ted Davis
Maryland Public Service Commission

6 St. Paul Street
Baltimore, MD 21202

    <u>Counsel for Intervenor-Respondent Maryland Public Service Commission</u>

Adrienne E. Clair
Jecoliah R. Williams
Thompson Coburn
1909 K Street NW
Suite 600
Washington, DC 20006

    <u>Counsel for Intervenor-Respondent Old Dominion Electric Cooperative</u>

Jeffrey A. Lamken
Lucas M. Walker [ARGUED]
Jennifer E. Fischell
Jackson A. Myers
MoloLamken
600 New Hampshire Avenue NW
The Watergate, Suite 500
Washington, DC 20037

    <u>Counsel for Intervenor-Respondent PJM Interconnection L.L.C.</u>

Jeffrey W. Mayes
Monitoring Analytics
2621 Van Buren Avenue

7

Suite 160
Eagleville, PA 19403

Counsel for Intervenor-Respondent Monitoring
Analytics LLC

Thomas L. Rudebusch
Duncan Weinberg Genzer & Pembroke
1667 K Street NW
Suite 700
Washington, DC 20006

Counsel for Intervenor-Respondent Delaware
Municipal Electric Corp Inc.

Gerit F. Hull
American Municipal Power, Inc.
1111 Schrock Road
Suite 100
Columbus, OH 43229

Counsel for Intervenor-Respondent American
Municipal Power, Inc.

_____

OPINION OF THE COURT
_____

CHAGARES, Chief Judge.

    In these consolidated petitions, the petitioners challenge orders of the Federal Energy Regulatory Commission

("FERC") on the ground that FERC allowed a new auction rule to apply retroactively to a pending auction. PJM Interconnection L.L.C. ("PJM"), the entity in charge of running the auction, applied this new rule to determine the auction results. The petitioners contend that FERC's orders violate the filed rate doctrine, which forbids retroactive rates. We agree. We will grant the petitions and vacate the orders in relevant part.

## I.

Although the legal principles governing this case are relatively straightforward, the background is complex. We lay the groundwork with an overview of the statutory basis for the filed rate doctrine, followed by a description of the tariff, or rate, at issue here. Then we discuss the events leading up to FERC's orders and summarize FERC's resolution of the matter.

## A.

Section 201 of the Federal Power Act ("FPA"), 16 U.S.C. § 824(b), grants FERC exclusive jurisdiction over the rates for the transmission and wholesale of electric energy in interstate commerce. FERC v. Elec. Power Supply Ass'n, 577 U.S. 260, 264–66 (2016). Section 205 of the FPA requires that all rates related to the transmission or sale of electric energy, and all related rules and regulations, are "just and reasonable" and not "undu[ly] preferen[tial]." 16 U.S.C. § 824d(a)–(b). The rates a utility charges must first be filed with FERC and be made publicly available. Id. § 824d(c). Once filed, "no change shall be made . . . in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto,

9

except after sixty days' notice to the Commission and to the public" through another filing with the agency. Id. § 824d(d). Section 206 empowers FERC to fix or change unjust and unreasonable rates and charges, but only prospectively. Id. § 824e(a).

These statutory provisions "mandating the open and transparent filing of rates and broadly proscribing their retroactive adjustment are known collectively as the 'filed rate doctrine.'" Old Dominion Elec. Coop. v. FERC, 892 F.3d 1223, 1226–27 (D.C. Cir. 2018); see also Borough of Ellwood City v. FERC, 583 F.2d 642, 648 (3d Cir. 1978) ("The filed rate doctrine is . . . an application of explicit statutory language."). The filed rate doctrine "bind[s] regulated entities to charge only the rates filed with FERC and to change their rates only prospectively." Okla. Gas & Elec. Co. v. FERC, 11 F.4th 821, 829 (D.C. Cir. 2021); see Ark. La. Gas Co. v. Hall, 453 U.S. 571, 577–78 (1981). The doctrine is unbending regardless of where the equities lie. Okla. Gas, 11 F.4th at 829–30.

Importantly, the filed rate doctrine "is not limited to rates *per se*, but also extends to matters directly affect[ing] . . . rates." Id. at 829 (cleaned up) (quoting Nantahala Power & Light Co. v. Thornburg, 476 U.S. 953, 966–67 (1986)). This stems from the text of the FPA, which "prohibits changes, not just to a rate, but also to 'any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto.'" Id. at 830 (quoting 16 U.S.C. § 824d(d)). In this case, the petitioners and FERC agree that the filed rate is the PJM Open Access Transmission Tariff ("Tariff"), which sets forth the procedures governing PJM's capacity auctions. See PJM Interconnection, L.L.C., 184

10

FERC ¶ 61,055, at 16 ¶ 28 (2023) ("Rehearing Order") ("PJM's relevant rate on file with the Commission is the BRA procedures, i.e., the market rules governing the conduct of the capacity auctions . . . ."); PJM Interconnection, L.L.C., 182 FERC ¶ 61,109, at 79 ¶ 165 (2023) ("Initial Order") ("The filed rate doctrine thus applies to those rules as it would a stated rate, requiring that the rules be on file with the Commission and that changes apply only prospectively."); FERC Br. 26 ("[T]hose [auction] rules are deemed to be part of the filed rate itself."); Pets. Br. 10.[1]

B.

PJM is a FERC-regulated wholesale market operator that covers thirteen states and the District of Columbia. To ensure reliable electric supply at competitive prices, PJM administers capacity auctions. "Capacity" is simply a commitment by electric suppliers to produce electricity at a certain time in the future. In a capacity auction, electricity-generating resources (also known as suppliers or sellers) bid on a price they are willing to accept in exchange for committing their resources to provide electricity to the interstate electric grid in the future. PJM employs an optimization algorithm tool that assesses these bids against PJM's projected demand curve, resulting in a "clearing price" for each geographic region

---

[1] Citations to the Initial and Rehearing Orders reflect the page and paragraph of the slip decisions. The Tariff is available at https://etariff.ferc.gov/tariffbrowser.aspx?tid=1731 [https://perma.cc/F7FN-EWAY].

covered by the auction. All suppliers that clear the auction receive the clearing price.

In this case, PJM administered a capacity auction in December 2022 for capacity in the June 2024 – May 2025 period (the "Auction"). PJM ran the Auction according to the rules set out in the Tariff, which again is the filed rate in this case.

The Tariff provides a detailed roadmap of how the Auction must unfold. Prior to conducting the Auction, PJM must calculate and publicly post the parameters, or inputs, it will use in the Auction. As relevant here, one of these parameters is the Locational Deliverability Area ("LDA") Reliability Requirement.

The LDA Reliability Requirement is "the amount of capacity that must be produced to meet peak demand, including a reserve margin" for a PJM region. Del. Div. of the Pub. Advoc. v. FERC, 3 F.4th 461, 464 (D.C. Cir. 2021). The LDA Reliability Requirement is important to the Auction because it forms part of the demand curve in PJM's optimization algorithm. See FERC Br. 10; Appendix ("App.") 245 (Danly, Comm'r., dissenting from Rehearing Order) (describing the LDA Reliability Requirement as "the single most important input to the capacity auction along with the seller offers").

The Tariff next requires PJM to collect confidential offers from suppliers during the offer window. Every supplier who offers a price less than or equal to the clearing price is legally bound to provide capacity at the clearing price. Suppliers who attempt to back out of their binding offers after

12

the fact may incur significant penalties.  PJM Interconnection, L.L.C., 155 FERC ¶ 61,157, ¶ 18 (2016).

Once the offer window closes, the Tariff provides that PJM "shall employ an optimization algorithm . . . to evaluate the Sell Offers and other inputs to such auction to determine the Sell Offers that clear such auction."  Tariff, Attach. DD § 5.12.  After PJM runs the optimization algorithm, it clears the Auction by accepting offers, starting with the lowest price first until it obtains sufficient capacity to satisfy the capacity demands for each region.  All offers that clear the Auction receive the same clearing price for that region, which is equal to the price of the last (and highest) offer accepted for that region.  Tariff, Attach. DD § 5.14(a).  See, e.g., Hughes v. Talen Energy Mktg., LLC, 578 U.S. 150, 156 n.1 (2016) (describing this process); N.J. Bd. of Pub. Utils. v. FERC, 744 F.3d 74, 83–84 (3d Cir. 2014) (same).

Finally, PJM must "post the results of each auction as soon thereafter as possible."  Tariff, Attach. DD § 5.11(e).  PJM awards capacity commitments based on these results.

C.

The Auction in this case proceeded smoothly at first: PJM calculated and posted the Auction parameters on August 29, 2022, including the LDA Reliability Requirement; received offers from suppliers during the offer window (between December 7–13, 2022); and ran the optimization algorithm.[2]

---

[2] FERC contends that PJM never ran its optimization algorithm but that is contradicted by the record and by PJM itself.  In any event, we do not rely on this fact in our analysis.

PJM was scheduled to post the Auction results on December 20, 2022.

But PJM perceived a problem. Based on its preliminary assessment of the data, PJM realized that the Auction could result in a high clearing price for the DPL-South zone, a small region that covers the south of Delaware (the "DPL-South region"). According to PJM, this "anomaly" occurred because, as it turned out, the DPL-South region's LDA Reliability Requirement parameter rested on a faulty assumption. FERC Br. 13. The assumption was that certain resources would submit offers in the Auction, but many of those resources did not.[3] PJM estimated that the DPL-South region's clearing price could be four times higher (or over $100 million) if PJM could not correct this faulty assumption by adjusting the LDA Reliability Requirement downward to reflect certain resources' lack of participation in the Auction.

---

[3] Specifically, the LDA Reliability Requirement that PJM used for the DPL-South region assumed that certain generation resources would provide offers in the Auction. These resources included large power plants and solar facilities, both of which PJM considered relatively unreliable sources of power: if a large power plant experiences an outage, the DPL-South region would need a correspondingly large amount of imported energy, and if the weather is overcast, solar facilities would produce less power. As a result, PJM increased the DPL-South region's LDA Reliability Requirement in anticipation of these resources' participation in the Auction. When a significant amount of these resources ended up not submitting offers in the Auction, this resulted in a "double whammy" to the DPL-South region's clearing price. FERC Br. at 14.

14

PJM therefore halted the Auction and turned to FERC for permission to amend the Tariff to allow this downward adjustment.

## D.

PJM made two contemporaneous filings with FERC. First, it proposed an amendment to the Tariff under section 205 of the FPA (the "Tariff Amendment"). If approved, the Tariff Amendment would provide PJM the authority to adjust the LDA Reliability Requirement downward to reflect certain resources' lack of participation in the Auction. PJM requested permission from FERC to apply this new rule to the pending Auction as well as future auctions.

PJM's second filing was a complaint under section 206 of the FPA (the "Complaint"). Section 206 provided PJM a potentially different avenue to relief. To prevail, PJM would first have to show that its existing tariff was <u>unjust and unreasonable</u>. Once PJM made this showing, section 206 gave FERC broad discretion to fashion a just and reasonable remedy.

A divided four-commissioner panel of FERC granted the proposed Tariff Amendment in full and dismissed the Complaint as moot. The three commissioners in the majority ruled that the Tariff Amendment was consistent with the filed rate doctrine. The panel concluded that the Tariff Amendment was not retroactive because the Auction had not yet obligated any suppliers to provide capacity or determined clearing prices. The panel also rejected the notion that the Tariff Amendment was retroactive by allowing PJM to adjust the LDA Reliability

Requirement after it had already calculated and posted it. According to the panel, the posting requirement did not "preclude PJM from prospectively updating the manner in which that LDA Reliability Requirement is incorporated into a later phase of the auction process pursuant to a separate section of the Tariff." Initial Order at 82 ¶ 171.

Having determined that the Tariff Amendment did not violate the filed rate doctrine, the panel then concluded that it had authority to approve the Tariff Amendment because it was "just and reasonable" under section 205 of the FPA. Initial Order at 83 ¶ 173. The panel acknowledged that settled expectations were relevant to this inquiry but expressed skepticism that suppliers had settled expectations based on the posted LDA Reliability Requirement. Assuming that they did, the panel nonetheless concluded that those expectations were outweighed by the Tariff Amendment's benefits — namely, preventing an "exorbitant price increase" in the DPL-South region. Id.

FERC denied rehearing. It issued a rehearing order that reaffirmed the conclusions it reached in its initial order.

One commissioner dissented from both the initial and rehearing orders. In his view, the Tariff Amendment was an illegal attempt to change the LDA Reliability Requirement after it was established and after the Auction had run, in violation of the filed rate doctrine. The commissioner criticized the majority's decision as "a misguided attempt to protect consumers" that would actually "cause [them] more harm" because it would lead to "lost confidence" in the markets. App. 115 (Danly, Comm'r., dissenting from Initial Order).

16

After FERC approved the Tariff Amendment, PJM determined the Auction results using the adjusted LDA Reliability Requirement. PJM posted the Auction results on February 27, 2023, and awarded capacity commitments based on those results.

The petitioners — electric suppliers and their trade associations — filed petitions for review of FERC's initial and rehearing orders in this Court. We consolidated the petitions and permitted several intervenors to participate in this appeal.

II.

FERC had jurisdiction to approve the Tariff Amendment under section 205 of the FPA. 16 U.S.C. § 824d(e). We have jurisdiction to review FERC's orders under 16 U.S.C. § 825*l*(b).

We review FERC's orders under the Administrative Procedure Act and must set them aside if they are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). Further, we must set aside FERC's orders if they are "not in accordance with law" or are "in excess of statutory jurisdiction, authority, or limitations." Id. § 706(2)(A), (C); see FCC v. NextWave Pers. Commc'ns Inc., 537 U.S. 293, 300 (2003); New York v. Nat'l Highway Traffic Safety Admin., 974 F.3d 87, 94 (2d Cir. 2020); Hydro Res., Inc. v. EPA, 608 F.3d 1131, 1145 (10th Cir. 2010) (en banc). Although we generally give substantial deference to FERC's interpretation of filed tariffs, we do not defer to FERC when the tariff language is unambiguous. N.J. Bd. of Pub. Utils., 744 F.3d at 104 n.30; Old Dominion, 892 F.3d at 1230. When a tariff is

unambiguous, as here, we simply "apply that unambiguous meaning." Okla. Gas, 11 F.4th at 827.

III.

A.

To determine whether FERC's orders violate the filed rate doctrine, we must first define retroactivity.  The text of the FPA does not provide a definition.   The definition FERC proposes in this appeal is helpful:  "retroactive rules alter the past legal consequences of past actions."    Bd. of Cnty. Comm'rs of Weld Cnty. v. U.S. EPA, 72 F.4th 284, 293–94 (D.C. Cir. 2023) (citation omitted).  The court in Weld County drew this definition from Landgraf v. USI Film Prods., 511 U.S. 244 (1994), the Supreme Court's seminal opinion on retroactivity.   Landgraf concerned whether a civil rights plaintiff could avail herself of a newly enacted statute providing compensatory and punitive damages for Title VII violations.  Id. at 247.  In answering that question in the negative, the Court asked "whether the new provision attaches new legal consequences to events completed before its enactment."   Id. at 269–70.  The Court explained that a provision would be retroactive if, for example, it "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed."  Id. at 280.

The Court in Landgraf acknowledged that determining retroactivity "is not always a simple or mechanical task."  Id. at 268.  "Any test of retroactivity," it cautioned, "will leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect

18

philosophical clarity." Id. at 270. For that reason, it encouraged courts to rely on "familiar considerations of fair notice, reasonable reliance, and settled expectations [for] sound guidance." Id.

The petitioners ask us to ignore Landgraf but do not offer a different definition of retroactivity. They argue that Landgraf is inapposite because its reasoning derives from provisions in the United States Constitution, whereas the filed rate doctrine derives from the text of the FPA. Not so. While Landgraf tells us that the presumption against retroactivity derives from the Constitution, its analysis of when a legal requirement is retroactive does not turn on any specific text. That explains why courts routinely apply Landgraf's well-worn retroactivity principles to all sorts of agency actions — including FERC's. See Solar Energy Indus. Ass'n v. FERC, 80 F.4th 956, 981 (9th Cir. 2023) (citing cases "applying the principles of *Landgraf* to the analysis of regulatory retroactivity"); Weld Cnty., 72 F.4th at 292–94 (applying Landgraf to conclude that the EPA retroactively imposed a nonattainment designation on El Paso County, Texas); Bell Atl. Tel. Cos. v. FCC, 79 F.3d 1195, 1207 (D.C. Cir. 1996) (applying Landgraf to FCC orders). [4] Thus, we will use Landgraf as a guide to our retroactivity analysis.

---

[4] We note that recent decisions from the Court of Appeals for the District of Columbia Circuit applying the filed rate doctrine do not mention Landgraf, but their analysis is consistent with Landgraf. For example, in Oklahoma Gas, the court ruled that it would be retroactive for FERC to waive a tariff's one-year billing deadline after it had elapsed. 11 F.4th at 829. Waiving that requirement would be retroactive under Landgraf because it would alter the legal consequence of the regional

19

B.

The Tariff Amendment is retroactive because it altered the legal consequence attached to a past action when it allowed PJM to use a different LDA Reliability Requirement than the one it had calculated and posted.

1.

We begin with the text of the Tariff. See Okla. Gas, 11 F.4th at 827 ("A tariff provision must be understood according to its plain meaning, which we draw from its text and context."). The Tariff provides that PJM must "determine . . . the [LDA] Reliability Requirement . . . prior to the conduct of the . . . Auction." Tariff, Attach. DD § 5.10(a)(vi)(B). It further provides that PJM "will post" the LDA Reliability Requirement "prior to conducting the . . . Auction." Id. § 5.11(a). And the LDA Reliability Requirement "will be used for such . . . Auction." Id. § 5.10(a)(vi)(A). These provisions expressly require PJM to calculate and post the LDA Reliability Requirement prior to conducting the Auction and then use this parameter in the Auction.

---

transmission operator's failure to meet the billing deadline. In Old Dominion, the court ruled that it would be retroactive for FERC to waive a tariff's rate cap. 892 F.3d at 1231–32. Again, waiving that requirement would be retroactive under Landgraf because it would alter the legal consequence of the limit set by the rate cap.

Elsewhere, the Tariff sets forth limited circumstances in which PJM could adjust the LDA Reliability Requirement <u>after</u> it had run the optimization algorithm. For example, PJM may adjust the LDA Reliability Requirement "to reflect Price Responsive Demand." <u>Id.</u> § 5.11(e).[5] And PJM may also correct an "error" in the initial posting of auction results under certain circumstances. <u>Id.</u> In addition, PJM may apply certain mitigation techniques to account for market seller offer caps, the details of which are not relevant here. <u>Id.</u> § 6.2(b).

Read as a whole, the Tariff thus contemplates that the calculated and posted LDA Reliability Requirement must be used in the Auction but may be adjusted under certain limited, enumerated circumstances listed in the Tariff. The Tariff Amendment, however, added a <u>new</u> circumstance to this list: if certain resources did not participate in the Auction, PJM could adjust the LDA Reliability Requirement downward to reflect this circumstance. All parties agree that PJM had no authority under the Tariff to adjust the LDA Reliability Requirement downward to reflect this circumstance. Only the Tariff Amendment authorized this adjustment. <u>See</u> FERC Br. 39 (noting that the Tariff "at the time <u>lacked</u> a mechanism for adjusting the [LDA Reliability] Requirement" to account for certain resources' lack of participation in the Auction (emphasis added)); PJM Br. 15 (acknowledging that the Tariff Amendment authorized "an <u>additional</u> adjustment to LDA Reliability Requirements" (emphasis added)); Initial Order at 4 ¶ 5 ("PJM states that the current auction rules do <u>not</u> allow

---

[5] Price Responsive Demand "refers to end-use consumers capable of curtailing their energy use within a short timeframe in response to variable energy prices." FERC Br. 12 n.3 (citing Initial Order at 10 ¶ 17 n.58).

PJM to update the LDA Reliability Requirement during the auction process . . . ." (emphasis added)).[6]

2.

The unambiguous language of the Tariff and Tariff Amendment resolves this case. Under the Tariff, PJM calculated and posted the LDA Reliability Requirement (past action), and it was required to use it in the Auction (legal consequence). The Tariff Amendment, however, permitted PJM to use a different LDA Reliability Requirement to reflect certain resources' lack of participation. The Tariff Amendment thus altered the legal consequence attached to PJM's calculation and posting of the LDA Reliability Requirement. For that reason, it is retroactive.

FERC resists this conclusion. In its view, the Tariff Amendment is not retroactive because it did not alter the fact that PJM complied with the Tariff's LDA Reliability Requirement posting deadline. And FERC avers that PJM "used" the LDA Reliability Requirement in the sense that, by

---

[6] The canon of construction known as expressio unius est exclusio alterius, which means "the expression of one thing is the exclusion of the other," confirms this interpretation. United States v. Nasir, 17 F.4th 459, 472 (3d Cir. 2021) (en banc). The Tariff's inclusion of circumstances in which the LDA Reliability Requirement could be adjusted is evidence of its intent to exclude all other circumstances not enumerated. Because FERC and PJM concede that only the Tariff Amendment provided PJM the mechanism to make the adjustment it made, we need not rely on this interpretive canon alone.

22

the time it adjusted the LDA Reliability Requirement, the Tariff Amendment was on file and permitted this adjustment. FERC argues that PJM's compliance with "one stage of the auction process" did not preclude it from "updating the manner in which that LDA Reliability Requirement is incorporated into a later phase of the auction process." Initial Order at 82 ¶ 171.

We are unconvinced by the contortions in FERC's reasoning. The relevant inquiry is simply whether the Tariff Amendment alters the legal consequences attached to past actions. The Tariff is clear that PJM's calculation and posting of the LDA Reliability Requirement carried a legal consequence: it "will be used for such . . . Auction." Tariff, Attach. DD § 5.10(a)(vi)(A). That simple instruction means what it says: the calculated and posted LDA Reliability Requirement cannot be altered outside of the limited circumstances enumerated in the Tariff. Adjusting for certain resources' lack of participation was not one of them. Nothing in the Tariff contemplates that "use" of this LDA Reliability Requirement includes new updates at later stages of the Auction. Thus, PJM did not "use" the calculated and posted LDA Reliability Requirement as the Tariff required. The Tariff Amendment is therefore retroactive.

FERC's attempt to fall back on other Tariff provisions is unpersuasive. Section 5.12(a) of the Tariff provides that PJM must conduct the Auction while "minimiz[ing] the cost of satisfying the reliability requirements." Id. § 5.12(a). FERC seizes on this language to argue that PJM's actions comported with the Tariff. But this provision does not give PJM carte blanche authority to minimize costs. Instead, it expressly directs PJM (in the same sentence) to "respect[] all applicable

23

requirements and constraints." Id. Furthermore, it would not make sense to interpret section 5.12(a)'s general goal of minimizing costs to override the Tariff's specific requirement that PJM use the calculated and posted LDA Reliability Requirement in the Auction. See Okla. Gas, 11 F.4th at 828–29 ("Whenever possible, the provisions of a tariff should be interpreted harmoniously so as to give effect to all of its provisions to and to avoid rendering any provision meaningless." (quotation marks omitted)).

Section 5.11(e)'s "error" provision does not alter our result, either. That provision provides that PJM may correct "potential error[s] in the initial posting of auction results." Tariff, Attach. DD § 5.11(e). FERC claims that the artificially inflated costs in the DPL-South region constituted an "error" that PJM had authority to correct. Although section 5.11(e) does not define "error," it would be implausible to interpret that term to give PJM freewheeling discretion to adjust the LDA Reliability Requirement. Such an interpretation would render the Tariff's enumerated, limited circumstances in which PJM may adjust that parameter superfluous. Moreover, FERC's position is undermined by its own admission that the Tariff "lacked a mechanism" for adjusting the LDA Reliability Requirement downward to reflect certain resources' lack of participation. FERC Br. 39.[7]

_____

[7] We are similarly unpersuaded by PJM's reliance on section 9.2(b) of the Tariff, which authorizes PJM to seek "prompt" amendments to prevent "imminent severe economic harm to electric consumers." Tariff § 9.2(b). That provision allows PJM to bypass its ordinary process of consulting stakeholders before submitting a section 205 filing. Of course, PJM is free to seek tariff amendments on an emergency basis. But FERC

24

FERC also relies on West Deptford Energy, LLC v. FERC, 766 F.3d 10 (D.C. Cir. 2014), where the court vacated a FERC order that failed adequately to explain why FERC applied a superseded tariff to an agreement filed after the new tariff's effective date. Id. at 25. But that decision is inapposite. Under its own precedents, FERC was required in that case to apply the rate on file — the new tariff — to the agreement. Id. at 19. Here, by contrast, FERC allowed PJM to apply a new rule to an auction that was already underway, with the effect of altering a legal consequence that attached to a past action in the Auction.

FERC cites Louisiana Public Service Commission v. FERC, 10 F.4th 839 (D.C. Cir. 2021), for the proposition that "the rule against retroactive ratemaking does not protect a utility's expectation that a rate will not change in the future." Id. at 848. That is true, but beside the point. Here, the Tariff Amendment did more than just disappoint expectations; it nullified a legal consequence attached to a past action taken in the Auction. Thus, it is retroactive, and FERC violated the filed rate doctrine by approving it.[8]

---

is not free to approve amendments that violate the filed rate doctrine, regardless of the equities. See infra Part III(C).

[8] The petitioners also argue that the Tariff Amendment is retroactive because it allowed PJM to disregard the Auction results. FERC maintains that the Auction produced no results at the time it was halted. We decline to consider this alternative argument because it is unnecessary to the resolution of this case.

25

C.

We emphasize that the equities play no role in our application of the filed rate doctrine. It is well established that the filed rate doctrine "does not yield, no matter how compelling the equities." Okla. Gas, 11 F.4th at 829–30 (quotation marks omitted). Accordingly, if FERC "violated the filed rate doctrine or the rule against retroactive ratemaking, we would not then invoke the Commission's assessment of the equities to overcome those violations." Id. at 832 (quoting Pub. Utils. Comm'n of the State of Cal. v. FERC, 988 F.2d 154, 168 n.12 (D.C. Cir. 1993)).

This bright-line rule could potentially produce a harsh result in this case, but it advances a central purpose of the filed rate doctrine: predictability. See AT&T Corp. v. Core Commc'ns, Inc., 806 F.3d 715, 731 (3d Cir. 2015); Old Dominion, 892 F.3d at 1230; W. Deptford, 766 F.3d at 12. Courts have described the doctrine as a "two-way street" because it requires "steady application regardless of what party is seeking to reexamine the past." Pub. Utils. Comm'n of the State of Cal. v. FERC, 894 F.2d 1372, 1383–84 (D.C. Cir. 1990). The doctrine forbids "post hoc tinkering," id. at 1383, even where, as here, FERC claims its actions correct "errors of judgment" or avoid "distortion in market signals," Columbia Gas Transmission Corp. v. FERC, 895 F.2d 791, 797 (D.C. Cir. 1990).

Why is predictability of such importance? First, because Congress said so. Recall that the filed rate doctrine is "an application of explicit statutory language." Borough of Ellwood City, 583 F.2d at 648. As one court has observed, the filed rate doctrine "reflects a congressional determination that

parties in the industry need to be able to rely on the finality of approved rates, and that this interest outweighs the value of being able to correct for decisions that in hindsight may appear unsound." Pub. Utilities Comm'n of the State of Cal., 894 F.2d at 1383. FERC has no authority to disregard Congress's will, and neither do we.

The second reason predictability is important is because electricity markets depend on it. Stable markets depend on stable rules. FERC's position makes auction rules inherently unstable because, in its view, it can change auction rules any time before clearing prices are final and capacity commitments are awarded without running afoul of the filed rate doctrine. Initial Order at 79 ¶ 167; Oral Arg. 26:00–26:28. FERC's disregard of the filed rate doctrine as a limiting principle creates unpredictability in the markets. Under FERC's interpretation of the filed rate doctrine, suppliers must submit binding offers "with no assurance about what rules may eventually be applied." App. 251 (Danly, Comm'r., dissenting from Rehearing Order). Auction rules would become, at best, a "moving target." App. 129 (Danly, Comm'r., dissenting from Initial Order). By eroding confidence in the markets, FERC may ultimately harm consumers who buy electricity in those markets.

D.

The petitioners ask us to vacate the orders approving the Tariff Amendment. But only the portion of the orders that allows PJM to apply the Tariff Amendment to the 2024/25 capacity auction is retroactive. The petitioners do not argue that applying the Tariff Amendment to some other capacity auction in the future would be retroactive. We will therefore

27

vacate only the portion of FERC's orders that allows PJM to apply the Tariff Amendment to the 2024/25 capacity auction. See Weld Cnty., 72 F.4th at 296 ("[J]udicial remedies should be 'no more burdensome to the defendant than necessary to provide complete relief' to the plaintiffs or petitioners." (quoting Califano v. Yamasaki, 442 U.S. 682, 702 (1979))).

IV.

We will grant the petitions for review and vacate the portion of FERC's orders that allows PJM to apply the Tariff Amendment to the 2024/25 capacity auction.